UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

RYAN JAMES VANSOLKEMA,

                Debtor.

_____/

Case No. DG 13-02691
Hon. Scott W. Dales
Chapter 7

OPINION AFTER TRIAL

PRESENT:    HONORABLE SCOTT W. DALES
                      Chief United States Bankruptcy Judge

## I. INTRODUCTION

After persuading the court to reopen his no-asset chapter 7 bankruptcy case, Ryan James VanSolkema moves for an order finding his ex-wife, Kimberly Parker, and her father, Anthony Parker (collectively, the "Parkers"), in contempt of the discharge injunction. He also seeks compensation for the alleged contempt, primarily for attorney fees he incurred to defend himself in the Family Division of the Kent County Circuit Court (the "Family Court"), and in prosecuting his contempt motion.

This contested matter requires the court to determine whether the Parkers violated the discharge injunction by seeking a judgment against Ryan VanSolkema ("Mr. VanSolkema" or the "Debtor") in the Family Court, purportedly to effectuate a hold-harmless provision within a divorce judgment and maximize Ms. Parker's share of a future inheritance from her father.

The court conducted a bench trial on June 23, 2016, in Grand Rapids, Michigan, during which it heard testimony from the parties (Mr. VanSolkema and the Parkers), and also from Mr. VanSolkema's original bankruptcy attorney, Timothy Taylor. In addition to the testimonial evidence, the court admitted 44 documents, largely without objection.

One key piece of evidence—an e-mail message from the Parkers' attorney to Mr. VanSolkema's attorney—drew a pretrial objection under Fed. R. Evid. 408 that the court treated as a motion in *limine*.  For the reasons set forth on the record and in a Supplemental Opinion dated May 5, 2016 (ECF No. 53), the court overruled the Parkers' objection and admitted the document at the hearing on the merits.  *See* Exh. 9.A.

After considering the testimony and documentary evidence offered during the evidentiary hearing, the court finds that the Family Court proceedings were merely a pretense for collecting an admittedly discharged debt, with father and daughter colluding to collect a debt in contempt of this court's discharge order.

Accordingly, the court will amplify the discharge by enjoining further prosecution of the Parkers' claims in the Family Court and awarding attorney's fees, in an amount to be determined, to compensate Mr. VanSolkema for having to defend himself in the Family Court and enforce the discharge in the United States Bankruptcy Court.

The following constitutes the court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, made applicable by Fed. R. Bankr. P. 7052.

## II. JURISDICTION

The United States District Court for the Western District of Michigan has jurisdiction over the bankruptcy case of Mr. VanSolkema pursuant to 28 U.S.C. § 1334(a), and has referred the case (and related proceedings) to the United States Bankruptcy Court pursuant to 28 U.S.C. § 157(a) and W.D. Mich. LCivR 83.2(a).  Disputes affecting a debtor's discharge or concerning the scope of the discharge clearly fall within the "core proceedings" identified in 28 U.S.C. § 157(b)(2)(I) and (O), and federal courts—including bankruptcy courts—have inherent authority to enforce their

orders using the civil contempt power, as the court observed in its Pretrial Order dated December 11, 2015 (ECF No. 34).

Under the circumstances, the court has no doubt about its authority to enter a final order resolving this dispute between the Debtor and the Parkers, and the parties have raised no such concerns about its authority.

## III. ANALYSIS

A. Findings of Fact

This dispute has its origins in a father's natural desire to provide support for his daughter after she (and her husband) experienced financial hardships during the so-called "Great Recession." Mr. VanSolkema, who worked in the mortgage business, lost his job when the real estate bubble burst. His wife, Ms. Parker, struggled to start a small business to help make ends meet. Accustomed to living well, the couple had difficulty adjusting to the financial reversal resulting from the job loss so they turned to Ms. Parker's father, travelling to the family home in Charlevoix to ask for his help, at least until they could get back on their feet.

Mr. Parker, a retired businessman, agreed to provide support by pledging some of his financial assets and his credit to open a line of credit upon which the couple could draw to pay their household expenses and credit card bills. Specifically, sometime in September 2007, the three family members co-signed a promissory note in favor of Fifth Third Bank ("Fifth Third"), with a one-year maturity date but renewable annually. Either because Fifth Third insisted, or perhaps to get better terms from the bank, Mr. Parker co-signed the promissory note and agreed to provide collateral to secure the threesome's joint and several obligations to Fifth Third. This 2007 promissory note is not in evidence, but the court infers its existence from the testimony and other

documents admitted at trial.  The 2008 note and 2009 loan documents were admitted.  *See* Exhs. H.2, 9.B, and H.7.

Apart from the Fifth Third loan documentation, the three family members signed a "Letter of Intent" (Exh. H.1) to memorialize their own understanding with respect to the funds that Kim and Ryan intended to borrow from Fifth Third.  The Letter of Intent makes clear that Mr. Parker was functioning as the couple's surety, not a donor, and provides for Mr. Parker's supervision over the couple's use of the line of credit to be provided through Fifth Third Bank.  This document, evidently drafted by non-lawyers, did not use the term "joint and several" to describe the obligation of Ms. Parker and Mr. VanSolkema to Mr. Parker.  Indeed, the Letter of Intent does not directly anticipate the consequences of default or Mr. Parker's rights should he (or his property) be called upon to satisfy the debt to Fifth Third.  Nevertheless, testimony established that both Mr. VanSolkema and Ms. Parker knew that Mr. Parker was not making a gift, and that they both intended to repay him.

The couple took full advantage of the Fifth Third line of credit, eventually borrowing the maximum allowed—$60,000.00.  In addition, at some point, the parties folded Kim's separate business debt into their joint and several obligation to Fifth Third.  As a result of the last renewal of the line of credit in 2009, the debt to Fifth Third grew to approximately $85,000.00—$60,000.00 allocable to the marital expenses, and $25,000.00 allocable to Ms. Parker's separate business loans that remained unpaid after the bank called her loan.  *See* Exh. H.7.  Under the terms of the Fifth Third loan documents executed in 2009, the three co-signers were each jointly and severally liable for the entire debt to the bank (business and non-business debts alike).

Sometime in 2012, Mr. Parker paid Fifth Third in full.  Because the role he played in the Fifth Third transaction was that of a surety—he did not receive the loan proceeds—he turned to his daughter and her husband for reimbursement.

The testimony was conflicting about whether the terms of the parties' 2007 Letter of Intent continued to govern the lending relationship after the several renewals of the original promissory note, but the record shows that at no time did they formally amend the 2007 document, as contemplated in the last paragraph of the only signed writing among the three family members. As noted above, however, Mr. Parker had no intention of forgiving the debt or making a gift to either Ms. Parker or Mr. VanSolkema in connection with the Fifth Third payoff.

During his testimony, Mr. Parker credibly explained that he and his wife have always treated their three daughters equally in terms of the gifts they bestowed and other parental support over the years, so forgiving Ms. Parker's obligation would unfairly benefit her, compared to her sisters.  Mr. Parker also credibly testified that his estate plan provides for reducing the inheritance of each of his daughters—including his daughter, Kim—by any debts they owed at the time the estate plan's distribution scheme took effect, upon the later of his or his wife's death.  Indeed, as explained more fully below, this future or anticipated offset of Ms. Parker's inheritance against her indebtedness was the pretense of seeking post-divorce relief in the Family Court.

Although Mr. Parker was not willing to forgo reimbursement, he was willing to accommodate the couple's apparent inability to repay him, realizing that their money problems were putting pressure on their marriage.  Hoping to see the couple through their financial (and, by then, marital) difficulties, Mr. Parker agreed to accommodate Mr. VanSolkema and Ms. Parker in several significant ways, as set forth in the testimony directly, but also in the separate payment schedules discussed more fully below.  *See* Exh. 9.E, I and J (payment schedules).

First, Mr. Parker did not demand immediate payment, which he might have been entitled to do under Michigan law as a surety who paid the debt.  Rather, he agreed to accept payment over time in interest-only installments, thereby modifying the couple's obligations from what would have applied under the Fifth Third note.

Second, he agreed to reduce the couple's interest expense by lowering the rate from prime minus 1%, applicable under the final version of the Fifth Third note, to 2.61%.  *See* Exhs. 9.E, I and J (payment schedules).  The court regards this as a significant departure from the terms of the Fifth Third note.

Third, Mr. Parker divided up the couple's obligation to pay him back for retiring the Fifth Third note, evidently to accommodate their decision to change the way in which they were managing their household finances.  Before July 2012, Mr. VanSolkema and Ms. Parker had been pooling their income and other resources and paying their mortgage, utilities, and other marital bills out of single account.  This evidently was not working for them after Mr. VanSolkema lost his job, and was putting a strain on the marriage.  To ease the stress, they decided to try separating their obligations, assigning each spouse a share of the marital debt and expenses.  Among the obligations they separated was the debt to Mr. Parker.  Mr. Parker again agreed to help.

Acceding to his daughter's request, Mr. Parker directed his accountants to prepare two separate payment schedules: one for Mr. VanSolkema, comprising his half of the former Fifth Third marital debt ($30,000.00), and another schedule for Ms. Parker, combining her half of the marital debt ($30,000) with the debt incurred in connection with her business ($10,928.00).  *See* Exh. I (Ryan's repayment schedule) and Exh. J (Kim's repayment schedule).

Shortly after receiving the separate repayment schedules, each spouse began making his and her respective payment of $250.00 per month, for a total monthly payment to Mr. Parker of $500.00.

Around that same time, while facing these financial pressures, the couple consulted a bankruptcy attorney. Despite this initial consultation, they elected not to file a joint petition. Within the year, however, the financial pressure on Mr. VanSolkema evidently began to mount, and he attempted to persuade Ms. Parker to file. She declined to do so out of concern for her credit and reputation, but that did not deter her husband. On March 30, 2013, with the assistance of attorney Timothy Taylor, Mr. VanSolkema filed a voluntary petition for relief under chapter 7. His wife did not file for relief under the Bankruptcy Code at that time or any time thereafter.

Still married to Ms. Parker and desiring at that time to protect his father-in-law from the impact of the bankruptcy filing, Mr. VanSolkema omitted from his schedules any mention of Mr. Parker's claim. Despite the assistance of bankruptcy counsel, Mr. VanSolkema evidently thought it was permissible or appropriate not to "bankrupt this debt" because, at that time, he intended to pay Mr. Parker back under the payment schedule. For his part, Mr. Taylor assumed that the intra-family obligations would be addressed within the family, so he saw no point in advising Mr. VanSolkema to schedule Mr. Parker's claim. This explanation at trial differed from the explanation offered in the Amended Motion to Reopen Case to Allow Debtor to Amend Schedule F to List Additional Creditor ("Motion to Reopen," Exh. 13), which recites that Mr. VanSolkema did not list Mr. Parker as a creditor because he regarded the Fifth Third loan transaction as giving rise to either a "generous gift" or a "loan from father to daughter (i.e., the Debtor's wife)." *See* Exh. 13 (Motion to Reopen at ¶ 4). In fact, Mr. VanSolkema made several post-petition payments, and at least one payment after the court entered a discharge on July 22, 2013 (the "Discharge")

from which the court infers that Mr. VanSolkema felt at least a moral obligation to make payments to his father-in-law, until the divorce proceedings began.[1]

It also appears that neither Mr. Taylor nor Mr. VanSolkema considered listing Ms. Parker as a creditor, despite the possibility of a contribution claim under § 509, again because  Mr. Taylor assumed that his client and Ms. Parker would take care of the obligations through informal family arrangements, as the parties were still a family on the petition date.

According to the court's docket in this matter, Fed. R. Evid. 201, Mr. VanSolkema's bankruptcy case was a "no asset case," meaning that his chapter 7 trustee had determined there were insufficient non-exempt assets to justify filing proofs of claim.  The case proceeded normally, and the court entered the Discharge.  Mr. VanSolkema made at least one payment to Mr. Parker after this.  The court closed the bankruptcy case on August 26, 2013.

Within a few months after entry of the Discharge, and after about fifteen years of marriage, Ms. Parker filed for divorce.  From the parties' account, even though the couple had no children, the divorce proceeding was bitterly contested and unduly expensive.

During the divorce proceedings, the treatment of the estranged spouses' obligations to Mr. Parker was a significant sticking point.  Ms. Parker contended that Mr. VanSolkema's Discharge would effectively shift the entire debt to her, requiring her to pay Mr. Parker the entire balance of $60,000.00, while Mr. VanSolkema contended that each former spouse was only responsible for half of the original balance, and that he no longer had any obligation to pay anything with respect to that debt.

After months of negotiation, and on the eve of trial in the Family Court, Mr. VanSolkema and Ms. Parker signed a consent judgment of divorce.  *See* Exh. B (Judgment of Divorce dated

---

[1] *See* 11 U.S.C. § 524(f) (debtor may voluntarily pay discharged debt).

May 1, 2014)(the "JOD").  In an effort to address the sticking point of the debt to Mr. Parker, the estranged spouses included the following term in the JOD, which acknowledged their difference of opinion:

> Each of the parties shall be responsible for the respective obligations, if any, owed to Anthony B. Parker and which is specifically denied by Defendant, and each party holds the other party harmless on their respective obligations to Anthony B. Parker.

*See* Exh. B (JOD at ¶ 3(e)(iii), the "Hold Harmless Term").  As Mr. DeJong, Ms. Parker's attorney in the divorce proceeding, stated in an August 23, 2014 e-mail to Mr. Taylor about the divorce: "[i]t was always our contention that Ryan's loan was a legal obligation that he needed to repay Kim's dad."  *See* Exh. 9.A.  Mr. DeJong explained that Ms. Parker agreed to permit Mr. VanSolkema to include the phrase "if any" in the Hold Harmless Term when describing his obligation to Mr. Parker because " . . . the dispute was really between Kim's father and Ryan—at least at that time, there seemed no reason to slug it out" in the Family Court.  *Id.*  Mr. DeJong evidently assumed that Mr. Parker's debt, because omitted from the schedules, had not been discharged at the time of the divorce proceedings.  *Id.*  This assumption, however, did not take into account the Bankruptcy Code's somewhat counter-intuitive treatment of omitted creditors in a no-asset case, such as the present.

On May 13, 2014, roughly two weeks after the Family Court entered the JOD including the Hold Harmless Term, Mr. VanSolkema and Mr. Taylor filed a motion with the Bankruptcy Court to reopen Mr. VanSolkema's bankruptcy case with the goal of amending Schedule F to list Mr. VanSolkema's debt to Mr. Parker. *See* Exh. 13.  Relying on *Zirnhelt v. Madaj (In re Madaj)*, 149 F.3d 467 (6th Cir. 1998), Mr. VanSolkema sought to establish that his debt to Mr. Parker (then in the amount of about $27,000.00) was in fact subject to the Discharge.  The court entered a form

order in response to Mr. VanSolkema's motion to reopen, indicating that the obligation would be subject to the Discharge unless Mr. Parker filed a complaint under § 523(a)(2), (a)(4) or (a)(6). Mr. Parker filed no timely response.

Mr. Parker's claim, based on a contractual or suretyship theory, is "not of a kind specified" in § 523(a)(2), (4), or (6). And, because Mr. VanSolkema's bankruptcy case was a "no-asset" case, there was no deadline for filing proofs of claim. Accordingly, Mr. Parker's claim, though originally omitted from Schedule F, did not survive discharge under § 523(a)(3)(A) and the Sixth Circuit's rationale in *Madaj*. In short, there is no dispute that his claim is subject to the Discharge even though Mr. VanSolkema originally omitted the debt to his father-in-law from his schedules. *See In re Wilcox*, 529 B.R. 231 (Bankr. W.D. Mich. 2015).

The same principle bars whatever contribution or indemnification claim that Ms. Parker might have asserted against Mr. VanSolkema before he filed his chapter 7 petition.[2] The fact that any claim may have arisen in the divorce proceeding or after the order for relief in the chapter 7 proceeding may give Ms. Parker an argument that whatever claim she has against Mr. VanSolkema, given their supposed joint and several liability to her father, was not subject to the Discharge.

Between August 2014 and December 2014, the Parkers' attorney, Robert DeJong, and Mr. VanSolkema's attorney, Timothy Taylor, exchanged several e-mails regarding the debt that the Parkers claimed remained due from Mr. VanSolkema, notwithstanding the Discharge.

Indeed, the e-mail from Mr. DeJong to Mr. Taylor clearly concedes that Mr. VanSolkema's debt to Mr. Parker had been discharged by the time of the August 23, 2014 demand for payment because he recognizes that Mr. Taylor "did [his] magic with the additional post-bankruptcy

---

[2] If Ms. Parker has a claim against her ex-husband, it owes its existence to the post-petition Judgment of Divorce.

motions, and that pushed father into the posture of then having to recover the loan from his daughter." *See* Exh. 9.A (e-mail dated August 23, 2014 from Mr. DeJong to Mr. Taylor).

In response to the inquiries from Mr. DeJong directed at requiring Mr. VanSolkema to pay his share of the debt to Mr. Parker, Mr. Taylor requested additional information about the origins of the loan, whether it was a gift, the reason the parties settled the divorce case while leaving this important issue unresolved, and documents supporting the claim. From the e-mail correspondence and Mr. Taylor's own testimony, the court finds that at no time did Mr. Taylor suggest Mr. DeJong's demands violated the Discharge. In fact, Mr. Taylor characterized the dischargeability questions as "peripheral" presumably because he was not certain that his client had any obligation to Mr. Parker or Ms. Parker in the first place, regardless of any relief he obtained under the Bankruptcy Code.

Mr. DeJong responded to Mr. Taylor's request for documentation, but in the press of business Mr. Taylor did not reply to Mr. DeJong after receiving the additional information. Instead, on October 8, 2014, Mr. DeJong again took to his computer and sent another e-mail to Mr. Taylor:

> It has been nearly a month and a half since forwarding the documents and schedule to you. I am guessing that from the lack of response from you, that you have had to advise your client that he will end up being liable to Kim for his share of the loan from Mr. Parker. I am also guessing that both of you are hoping that "letting sleeping dogs lie" is the best strategy under the circumstances. But, in spite of appearances, this dog has not gone to sleep yet.

> So here's my question: is Ryan ready to do this the easy way? Or do we have to go through the long, more expensive route? I thought I should double check before filing anything. If I do not hear anything within five business days, I will conclude that our client will have to file a supplemental action in Kent County Circuit Court in order to obtain a court order and judgment against Ryan. . . .

*See* Exh. 9.A.  Two days later Mr. Taylor acknowledged the e-mail, at which point Mr. DeJong proposed that Mr. VanSolkema consent to judgment in Mr. Parker's favor, and even suggested a payment schedule to avoid collection activity in the Family Court.  *See* Exh. 9.A (e-mail dated October 10, 2014 from Mr. DeJong to Mr. Taylor).  As part of the proposal, however, Mr. DeJong specifically acknowledged Mr. VanSolkema's bankruptcy proceedings, stating that "[p]erhaps because of the bankruptcy, you will conclude that we can only enter the judgment in the divorce action." *Id.*  In this string of e-mails, acting on behalf of the Parkers, Mr. DeJong clearly evinces a knowledge of Mr. VanSolkema's bankruptcy proceedings and the Discharge, and suggests using the Family Court as a subterfuge and battle field if necessary.

When Mr. Taylor and Mr. VanSolkema did not capitulate by agreeing to a consent judgment in Mr. Parker's favor, *Ms. Parker* filed a Motion for Post-Judgment Relief on March 27, 2015 in the Family Court seeking judgment against Mr. VanSolkema in the amount of $27,766.66 plus accrued interest on any unpaid amount from September 20, 2013 to the date of the proposed judgment.  *See* Exh. C (Motion for Post-Judgment Relief, the "Family Court Motion").  The Family Court Motion recites that it seeks relief supplemental to the JOD, specifically to effectuate the Hold Harmless Term.  The putative theory of that motion, premised on the indemnification language, is set forth as follows:

> Kim requires the [Family] Court's assistance because Mr. Van Solkema has sought relief from having to pay his obligation to Anthony B. Parker in his bankruptcy proceedings. Consequently, Kim's father, Anthony B. Parker, has notified Kim that his estate plan, both at the time of the filing of the Complaint for Divorce, and currently, provide [sic] that any obligation of either Mr. Van Solkema, or of Kim which remains unpaid at the time of the death of Kim's parents shall be deducted from her share of the estate to which Kim would otherwise be entitled.  Thus, given Mr. Van Solkema's insistence that he no longer owes the money to Anthony B. Parker, it is apparent that Kim will be called upon to pay Mr. Van Solkema's indebtedness to Mr. Parker and Kim will therefore effectively end up indemnifying her father for Mr. Van Solkema's obligation.

*See* Exh. C at pp. 1-2. Ms. Parker filed the Family Court Motion, with her father's backing, to obtain a money judgment in the exact amount of the discharged debt on account of an anticipated set-off of a future distribution under her father's revocable, testamentary trust.

For nearly six months, at Mr. Parker's expense,[3] Ms. Parker pursued judgment against Mr. VanSolkema in the Family Court ostensibly for his share of the original $60,000.00 marital debt, with discovery-related motion practice, two depositions, and other proceedings before the Family Court.

Although the Parkers' counsel styled the Family Court Motion as a request for indemnification, Ms. Parker candidly admitted during the evidentiary hearing in bankruptcy court that she has not yet made any payments on account of Mr. VanSolkema's supposed share of the marital debt.

Nor, for that matter, have the offset provisions of Mr. Parker's estate plan taken effect, further undermining the "indemnification" premise for seeking judgment against Mr. VanSolkema in the Family Court. Both Mr. Parker and his wife are still alive, and the parties stipulated that the estate plan could be amended at any time before the death of either of them. Moreover, there are any number of contingencies that might preclude the offset of the testamentary distribution that supposedly prompted the Family Court Motion, such as family strife (and disinheritance), intervening gifts to siblings, or perhaps exhaustion of the father's estate for one reason or another. Viewed most charitably, the Family Court Motion asks for an order requiring Mr. VanSolkema to pay $27,766.66 now because his Discharge may reduce a testamentary gift Ms. Parker hopes to receive later.

---

[3] Mr. Parker admitted that he "was helping with the bill to be paid" in connection with the Family Court proceedings. *See* Exh. 1 (Deposition of Anthony Parker, September 9, 2015, at 18:19-20:4).

Regardless of the likelihood of any offset, the fact remains that Ms. Parker filed the Family Court Motion seeking indemnification before she had suffered any harm resulting from Mr. VanSolkema's discharge of his debt to Mr. Parker.  This simple fact casts doubt on the *bona fides* of the supposed indemnification theory, making the Family Court proceedings a thinly-veiled attempt to collect Mr. Parker's debt (as Mr. DeJong's e-mail predicted).

B. Conclusions of Law

A bankruptcy discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived." 11 U.S.C. § 524(a)(2).  Courts generally enforce the discharge as they would any other injunction, using their contempt power.  *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 421 (6th Cir. 2000).

Bankruptcy courts do not have criminal contempt powers, so they cannot punish contemnors for violating court orders, including discharges.  *See In re Lawrence*, 164 B.R. 73 (W.D. Mich. 1993).  Instead, they take steps to coerce compliance and compensate other parties injured by the contemptuous behavior.  *In re Burkman Supply, Inc.*, 217 B.R. 223 (W.D. Mich. 1998).  The goal is remediation.

In the context of discharge-related contempt proceedings, bankruptcy courts within the Sixth Circuit generally subscribe to the following précis of applicable standards, requiring the debtor to prove that the creditor willfully violated the discharge injunction:

> The question of whether the violation is willful is based on whether the creditor intended the acts that constituted the violation. The standard does not require proof that the creditor deliberately violated the injunction. Thus, a debtor who alleges a violation of § 524(a)(2) must establish by clear and convincing evidence (1) the creditor violated the discharge injunction and (2) the creditor did so with actual knowledge of the injunction.

*Holley v. Kresch Oliver, PLLC (In re Holley)*, 473 B.R. 212 (Bankr. E.D. Mich. 2012) (citations omitted).  As the court recently explained, "[u]nder the precedents of our Circuit, a debtor who seeks to hold a creditor in contempt for violating the discharge injunction must 'show by clear and convincing evidence that [the creditor] violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order.'" *In re Hager*, 510 B.R. 131, 136 (Bankr. W.D. Mich. 2014) (citing *In re Stewart*, 499 B.R. 557, 573 (Bankr. E.D. Mich. 2013) and *Glover v. Johnson*, 138 F.3d 229, 244 (6th Cir. 1998)). The court's Discharge, based on the official form, certainly qualifies as a "definite and specific order."

After the debtor makes a *prima facie* showing of a violation, accused creditors have the burden of establishing the inability to comply with the injunction.  Outside the bankruptcy setting, the Sixth Circuit teaches that a contemnor's "good faith is not a defense to civil contempt." *Glover*, 138 F.3d at 244.  The court will apply these principles to the present dispute.

As for a remedy upon finding a violation, the court does not award "damages" in the usual sense (such as in a tort or contract action), but instead imposes a non-punitive award designed, as noted above, to compel compliance and compensate for noncompliance.  As the court noted in *Hager,* a creditor's violation of the discharge offends the court that issued the order designed to protect a debtor; the impact on the debtor, while important, is secondary.  This gives the court considerable latitude in fashioning an equitable remedy.

Returning to the facts adduced during the hearing, the court finds by clear and convincing evidence that Mr. Parker, with the assistance of his daughter and the lawyer they shared, attempted to collect a debt in the amount of $27,766.66 from Mr. VanSolkema despite the fact that the Discharge, entered on July 22, 2013, enjoined the collection activity.  This is a rare case in which

the creditors' plan to collect the discharged debt and their awareness of the discharge were documented, unapologetically, in writing from the creditors' agent, here Mr. DeJong. *See* Exh. 9.A (e-mail dated October 10, 2014 from Mr. DeJong to Mr. Taylor). The offending and revealing e-mails from October 8 and 10, 2014 acknowledged the Discharge and urged Mr. VanSolkema to agree to a consent judgment in favor of Mr. Parker for his share of the former marital debt to which Mr. Parker may have become subrogated by paying the Fifth Third loan in full.[4] Mr. DeJong himself acknowledges the effect of Mr. VanSolkema's bankruptcy proceeding, yet proposes an end-run around this court's Discharge (a definite and specific order) evidently hoping to take advantage of the Hold Harmless Term by purporting to enforce *Ms. Parker's* unripe indemnification claim.

When Mr. VanSolkema and Mr. Taylor did not succumb, Mr. DeJong, true to his word, filed the Family Court Motion (ostensibly on Kim's behalf) to pressure Mr. VanSolkema into paying the discharged debt. Even though the Family Court Motion acknowledges that Ms. Parker's indemnification claim is premature, this did not stop her from seeking judgment against Mr. VanSolkema in a specific amount, with interest and attorney fees. Moreover, during the hearing in bankruptcy court, the Parkers' counsel similarly acknowledged that the indemnification claim was premature and offered to withdraw it. *See* Exh. P. In her testimony, Ms. Parker admitted that she had not paid her father any money on account of Mr. VanSolkema's share of the former marital debt.

---

[4] A person who signs a note as obligor for the purpose of lending his credit or property to a loan transaction for the benefit of another, and who pays that obligation, may enjoy suretyship status under non-bankruptcy law and rights against the principal obligors. *See generally* Restatement (Third) of Suretyship & Guaranty § 1 (1996); *see also Gersonde Equipment Company v. Walters*, 363 Mich. 49, 53, 109 N.W.2d 1 (1961) (surety has right of reimbursement); *Neal v. Neal*, 219 Mich. App. 490, 495-96, 557 N.W.2d 133 (1996) (discussing equitable subrogation rights of surety). The Parkers make this point in their post-hearing brief.

Consequently, the court finds that the Family Court Motion was a ruse: as Mr. DeJong revealed in his communication with Mr. Taylor when explaining the Hold Harmless Term, "the dispute was really between Kim's father and Ryan." *See* Exh. 9.A. That statement was as true when the parties included the Hold Harmless Term in the JOD as when the Parkers sought to enforce it by filing the Family Court Motion.

The fact that Ms. Parker (with her father's financial support) sought to enforce an obviously and admittedly premature indemnification claim, together with the Hobson's Choice that Mr. DeJong proposed in his October 2014 e-mails to Mr. Taylor—either confess judgment in favor of Mr. Parker directly or endure expensive proceedings in Family Court—reinforce the court's conclusion that Ms. Parker and her father colluded, with common counsel purchased by Mr. Parker, to compel Mr. VanSolkema to pay Mr. Parker on account of the discharged debt.

The evidence in this case that "(1) the creditor violated the discharge injunction and (2) the creditor did so with actual knowledge of the injunction," *Holley*, 473 B.R. at 215, could hardly be clearer or more convincing.

In defense of the contempt charge, the Parkers essentially assert that they acted in the good faith belief that Ms. Parker was pursuing her indemnification rights premised on the allegation that she and Mr. VanSolkema remained jointly and severally obligated to Mr. Parker, just as they were jointly and severally obligated to Fifth Third under the various loan documents. The court is not persuaded for several reasons.

In addition to the segregation of the original $60,000.00 marital debt into "his and her" shares documented by Mr. Parker's accountants in separate payment schedules, the reduction of the interest rate, and the forbearance more generally, at no time did Mr. Parker seek to hold Mr. VanSolkema "jointly and severally" liable for Ms. Parker's business debt that was eventually

folded into the Fifth Third line of credit.  Nor did he even demand payment of the full $60,000.00 from Mr. VanSolkema, as one would expect from a surety who believed that each of the principal obligors was jointly and severally liable for the full debt.  The parties' conduct, including the conduct of Mr. Parker, was inconsistent with a surety's or equitable subrogee's enforcement of the original terms of the Fifth Third loan documents.

Moreover, the language of the Hold Harmless Term itself, particularly Mr. VanSolkema's, express rejection of any liability and the parties' mutual employment of the term "respective obligations," support an inference that the joint and several nature of the Fifth Third debt did not survive Mr. Parker's agreement to provide separate payment schedules.

The Parkers place undue emphasis on the 2007 Letter of Intent—the only documentary evidence from the inception of the transaction—to support their "joint and several liability" theory. Fairly read, the document says nothing specific about the nature of the couple's liability to Mr. Parker, but is instead more concerned about giving Mr. Parker control over the borrowing from Fifth Third.  Nor, for that matter, did the parties ever update that letter to address changes in their circumstances, including, for example, the folding of Ms. Parker's business debt into the Fifth Third line of credit after the bank called her loan.  The court does not regard the Letter of Intent as supporting the Parkers' argument for joint and several liability.

It is certainly conceivable that a person in the position of surety might insist on compliance with the terms of the original note—Mr. Parker clearly did not do so here—but it is equally clear that the parties in a suretyship relation may agree to different terms for reimbursement (as the court finds they did).  *See generally* Restatement (Third) of Suretyship & Guaranty § 6 (1996).  The court finds that Mr. VanSolkema and Ms. Parker were not jointly and severally obligated to repay Mr. Parker for satisfying the Fifth Third debt after he split the debt among his daughter and son-

in-law and modified other payment terms, as a father naturally might do upon learning of his daughter's financial distress. The splitting of the debt and non-joint nature of the obligation is also evident in the JOD's reference to "respective shares" of the debt. To be clear: Mr. VanSolkema was (prior to entry of the Discharge) responsible only for his half of the marital debt and, on the other side of the same coin, Ms. Parker was only responsible for her half.

The court certainly would understand, and indeed applaud, Ms. Parker's decision to pay her father for her ex-husband's now-discharged share of the marital debt to fulfill a moral or filial obligation. The court would also understand if Mr. Parker or his trust's eventual fiduciary elected to reduce Ms. Parker's inheritance (or trust distribution) out of a sense of fairness to his other daughters. Nevertheless, having heard the testimony and considered the other evidence (including the JOD), the court cannot, consistent with the Discharge, permit Ms. Parker to saddle her ex-husband with the consequences of either decision. She cannot do indirectly what her father cannot do directly.

Finally, given the important role that Mr. DeJong played in this affair, the court reiterates the point it made while explaining its decision not to exclude his e-mail correspondence with Mr. Taylor: a principal sometimes must pay the price for his agent's conduct—even when the agent is a lawyer. *See Pioneer Investment Servs. Co. v. Brunswick Assocs., L.P.*, 507 U.S. 380, 396-97 (1993) ("Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent"); *see also New Products Corp. v. Tibble (In re Modern Plastics Corp.)*, Slip Op., Case No. 09–00651, Adv. Pro. No. 13–80252 (Bankr. W.D. Mich. July 23, 2015) (citing *Pioneer Investment Services* and requiring client to pay discovery sanction for counsel's misuse of subpoena). The fact that the Parkers acted through an agent, or even relied on his advice as counsel, will not preclude a

contempt finding.  Good faith, even if supported by the proofs, is not a defense to contempt. *Glover*, 138 F.3d at 244.

Mr. Parker and Ms. Parker knowingly violated the Discharge by demanding payment from Mr. VanSolkema and by filing (and funding) the Family Court Motion.  The court, therefore, holds both in contempt of the Discharge.

## IV. CONCLUSION AND ORDER

As noted above, the court's contempt power is coercive and compensatory, not punitive. As to the first aspect, the court will enjoin Mr. Parker from taking any additional action to collect the debt at issue from Mr. VanSolkema, directly or indirectly, including through Ms. Parker's litigation in Family Court.  In addition, the court will direct Ms. Parker to withdraw the Family Court Motion, with prejudice, and refrain from filing additional motions or requests to enforce the Hold Harmless Term.

As to the second or compensatory aspect of the contempt power, the court will invite Mr. VanSolkema to file an itemized request for attorney fees (and related expenses) reasonably incurred as a result of the Parkers' contempt, especially those fees incurred in enforcing the Discharge.  Even though § 524 does not authorize relief other than injunctive relief, "the modern trend in civil contempt proceedings is for courts to award actual damages for violations of § 524's discharge injunctions, and where necessary to effectuate the purposes of the discharge injunction, a debtor may be entitled to reasonable attorneys fees." *In re Greenspan*, 2011 WL 310703, at *3 (quoting *Miles v. Clarke (In re Miles)*, 357 B.R. 446, 450 (Bankr. W.D. Ky. 2006); *In re Miller*, 247 B.R. 224 (Bankr. E.D. Mich. 2000).  This court follows the "modern trend": a debtor who, like Mr. VanSolkema, is injured by a willful violation of the discharge injunction is entitled to

damages, including reasonable attorney fees.[5]  To find otherwise would "render the discharge injunction without meaning or effect." *Miller*, 247 B.R. at 228.

Although Mr. VanSolkema has not provided the court with any detail or documentation of his legal expenses incurred in enforcing the Discharge, he will have an opportunity to do so, and the Parkers will have an opportunity to respond.[6]  The Parkers will have an opportunity to challenge the amount of the request before the court imposes a monetary award, based on the papers to be submitted.[7]  Naturally, the court encourages the parties to consider settling this aspect of the court's decision in an effort to avoid additional costs of litigation, both financial and emotional.

To avoid possible procedural confusion in case of appeal, the court will enter a separate order, after determining the attorney fee award, which will include the injunctive mandate and fee award.  This Memorandum of Decision and Order, therefore, does not finally resolve the contempt motion.  Although the court has yet to enter additional injunctive relief to address the contempt, it assumes the Family Court Motion will remain stayed by agreement of the parties.

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

(1) Within 14 days after entry of this Order, Mr. VanSolkema shall file with the court and serve upon the Parkers an itemized and verified request for attorney fees (and related expenses) reasonably incurred as a result of the Parkers' contempt, especially those fees and expenses incurred in enforcing the Discharge; and

---

[5] Throughout this contested matter, the only damage meaningfully suggested by Mr. VanSolkema was the cost of defending himself and seeking to enforce the Discharge.

[6] The court will not treat attorney fees incurred in bringing the contempt motion as an element of a debtor's contempt case, but instead will award fees upon separate application in view of its contempt finding.  *See* Fed. R. Civ. P. 54(d)(2)(A) ("A claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages").

[7] In exercising its discretion to mete out compensatory relief, the court will not be inclined to award Mr. VanSolkema significant fees incurred in defending against the Family Court Motion, given his delay in filing the contempt motion in this court and thus his failure to mitigate damages.

(2) Within 14 days after service of the itemization, the Parkers may file a response challenging the reasonableness of the fee request.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Order upon Kim Parker, Anthony Parker, Robert DeJong, Esq., Ryan VanSolkema, and John Potter, Esq., and shall also send a courtesy copy of the same by first class mail addressed to the Hon. Daniel V. Zemaitis, Kent County Circuit Judge.

END OF ORDER

**IT IS SO ORDERED.**

**Dated July 15, 2016**



Scott W. Dales
United States Bankruptcy Judge